UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

| | |
|---|---|
| ALISSA WILLIAMS,<br><br>        Plaintiff,<br><br>-against-<br><br>TRANS UNION, LLC and LEAD BANK,<br><br>        Defendants. | Case No.<br><br>COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT<br><br>JURY TRIAL DEMANDED |

Plaintiff Alissa Williams ("Plaintiff") brings this complaint against defendants Trans Union, LLC ("TransUnion" or the "Company") and Lead Bank ("Lead Bank") and alleges the following based upon Plaintiff's personal knowledge, information and belief, and the investigation of counsel, which included, without limitation, a review of TransUnion's SEC filings, website, and other publicly-available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## INTRODUCTION

1. This is an action to recover damages for violations of the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq.* (the "FCRA").

1

2. In September 2020, Plaintiff learned that her Lead Bank account was being reported as a currently delinquency on her TransUnion credit report, even though the account was paid and closed one year earlier. As a result, TransUnion continued to sell credit reports, predictive credit scores, risk assessments, and other credit analytics solutions that improperly reported and factored in a nonexistent current delinquency.

3. Although Plaintiff disputed the reporting in writing, TransUnion and Lead Bank refused to correct the reporting or remove the inaccurate and materially misleading current delinquency. Plaintiff was later denied an extension of credit based on a credit report prepared by TransUnion, and has been forced to deal with the aggravation and humiliation of a poor credit score. Accordingly, Plaintiff is entitled to damages.

## PARTIES

4. Plaintiff is a natural person and resides in Ocala, Florida. Plaintiff qualifies as a "consumer" as defined and protected by the FCRA.

5. Defendant TransUnion is an Illinois corporation that regularly conducts business in this district. TransUnion qualifies as a "consumer reporting agency" under the FCRA.

6. Defendant Lead Bank is a foreign corporation that regularly conducts business in this District. Lead Bank qualifies as a "furnisher" of credit information under the FCRA.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under §1681e(b), §1681i, and §1681s-2 of the FCRA.  This Court has subject matter jurisdiction under 28 U.S.C. §1331 and 15 U.S.C. §1681p.

8. Venue is proper in this District under 28 U.S.C. §1391(b).

## STATEMENT OF FACTS

**A.    The FCRA**

9. The FCRA is a federal statute designed to protect consumers from the harmful effects of inaccurate information reported in consumer credit reports.  Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. §1681a.

10. To that end, the FCRA imposes the following twin duties on consumer reporting agencies ("CRAs" or "credit bureaus"): (i) CRAs must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports; and (ii) CRAs must reinvestigate the

facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies.

11. Credit bureaus must immediately notify furnishers if a consumer disputes the accuracy of information reported by that furnisher. Section 1681s-2(b) requires a furnisher, upon receiving a consumer's dispute, to conduct a reasonable investigation, mark the account as disputed, and update the reporting if necessary.

12. The FCRA provides consumers with a private right of action against CRAs and furnishers that willfully or negligently fail to comply with their statutory obligations.

**B.  Defendants Reported A Nonexistent Current Delinquency on Plaintiff's Credit Report and Failed to Correct the Reporting in Response to Plaintiff's Dispute**

13. Plaintiff had a Lead Bank credit account and missed certain monthly payments. By November 2019, the account was paid in full and closed. Once that happened, any existing delinquency was cured and became a historic delinquency.

14. It is both factually inaccurate and materially misleading to record a historic delinquency as a current delinquency.

15. Yet, Lead Bank reported that Plaintiff's account was currently delinquent.

16. In or about October 2020, Plaintiff learned that the Lead Bank account was improperly being reported as a current delinquency, even though the account was paid and closed.

17. Specifically, Plaintiff reviewed her TransUnion consumer disclosure though CreditKarma, which showed that the "Current Payment Status" of the Lead Bank account was "60-89 days late." As explained *infra*, this reporting indicated that Lead Bank was improperly reporting a derogatory Payment Rating on the account.

18. As a result, TransUnion continued to sell credit reporting solutions, including credit reports, predictive credit scores, risk assessments, and other analytics solutions, that improperly factored in a nonexistent current delinquency.

19. On September 3, 2020, Plaintiff disputed the reporting by submitting a written dispute through TransUnion's respective FCRA compliance department. The dispute explained that it was inaccurate to report a current delinquency in the Pay Status field because the account was paid and closed.

20. It is reasonable to infer that TransUnion notified Lead Bank of the dispute, as required by federal statute.

21. The receipt of Plaintiff's dispute letter triggered TransUnion's and Lead Bank's statutory obligations to conduct an investigation, mark the account as disputed, and delete the current delinquency from Plaintiff's account.

22. TransUnion failed to conduct a reasonable investigation and failed to remove the current delinquency from Plaintiff's account.

23. Lead Bank purported to conduct an investigation, and then summarily verified that the current delinquency was accurate.

24. On February 4, 2021, Plaintiff applied for credit from Synchrony Bank/Paypal ("Synchrony") but was denied based on a credit report provided by TransUnion.

25. Notably, while Plaintiff's TransUnion credit disclosure confirms that Synchrony requested at least one of the various credit reporting solutions offered by TransUnion, it does ***not*** indicate: (i) the specific type of credit report that was requested or provided to Synchrony (ii) whether Plaintiff's credit application was auto-adjudicated using TransUnion's sophisticated decisioning technology; (iii) whether a credit score was provided to Synchrony; (iv) the extent to which the current delinquency on the Lead Bank tradeline was factored into credit reporting and/or decisioning solution relied upon by Synchrony; or (v) whether and to what extent Plaintiff's credit application was evaluated using "enriched" or "enhanced" data produced by TransUnion.

26. Plaintiff has since been forced to deal with the aggravation and humiliation of a poor credit score.

27. Accordingly, Plaintiff is entitled to damages.

### C. As the Furnisher, Lead Bank is Liable for Falsely Reporting that Plaintiff's Account was Currently Delinquent

28. A credit report is a record of a consumer's financial activity and history. It includes, *inter alia*, the names of companies that have extended credit to the consumer, and the terms of those loans, including the credit limits, loan amounts, and payment history.

29. CRAs are companies that maintain consumer credit files and generate credit reports when requested by the consumer, a lender, or another person or entity with the right to view the data.

30. Financial institutions that send information to CRAs are referred to as "furnishers."

31. Furnishers communicate with CRAs using a coded language called the Metro-2 format. The Metro-2 consists of codes and characters which furnishers use to populate data fields defined by the credit reporting agencies.

32. For example, as pertinent here, the Metro-2 directs furnishers to record an account's current payment status in the "Payment Rating" field using an ascending scale of alpha-numeric codes from least derogatory to most derogatory. Thus, a Payment Rating of "0" is reported for current accounts or accounts that are closed with a $0 balance. A Payment Rating of "1" is reported for accounts that are currently 30-59 days late, a "2" for accounts that are currently 60-89 days late, a "3" for accounts that are currently 90-119 days late, a "4" for accounts that are 120-149

days late, and a "5" for accounts that are currently 150-179 days late. A "G" is reported for accounts that are in collection. A "L" is reported for accounts that have been charged off. A current delinquency reported in the Payment Rating field is factored into credit reports, scores, and other credit solutions, and has a major derogatory impact on a consumer's credit score and perceived creditworthiness.

33. The data is transmitted by the furnisher to the CRA using third party software, and is then loaded into the CRA's credit file database.

34. When a consumer submits an application for credit, the lender (referred to by the credit bureaus as a subscriber or user) requests a credit report pursuant to the terms of its subscription agreement with the CRA. The CRA then compiles and delivers a credit report using information stored in the consumer's credit file.

35. Credit reports can take on many forms, depending, in part, on the identity of the requestor and the anticipated use of the report. Indeed, TransUnion acknowledges on its website that a consumer's credit report "is available in a few different places and formats." Regardless of the form, all data reflected in a credit report is supplied by the furnisher.

36. Here, when Plaintiff applied for credit, his application was denied based on a credit report that incorporated the inaccurate data furnished by Lead Bank.

**D.    TransUnion is Liable For Selling Credit Reports Containing Inaccurate Data That Is "Enriched," "Enhanced," and Reported in "New Fields"**

37. According to its 2019 Annual Report, filed on Form 10-K with the SEC on February 18, 2020, "TransUnion is a leading global information and insights company" that "leverage[s] data and information to help businesses and consumers transact with confidence." TransUnion's business model is grounded in its "legacy as a credit reporting agency," which enabled it to build a "robust" proprietary database of "relevant information obtained from thousands of sources including financial institutions, private databases, public records repositories, and other data sources."

38. After it receives the data, TransUnion "refine[s], standardize[s] and enhance[s] this data using sophisticated algorithms" and utilizes a "data fusion methodology to link and match an increasing set of disparate data" to "enrich" its database. This "enriched data" is used in an array of "solutions" including "consumer reports, actionable insights and analytics such as credit and other scores, and decision-making capabilities" that businesses use to "make informed decisions."

39. TransUnion currently offers "a diverse set" of 25 "innovative and differentiated" credit reporting solutions, which are sorted into four overlapping sub-categories: (i) credit reports; (ii) credit data; (iii) credit risk scores; and

(iv) alternative credit.[1] The nature of each product varies "based on business need," may draw on "unique data sets" or "alternative credit data," and may be complemented with "an exhaustive suite of credit risk scores."

40. Critically, the Company's 2019 10-K admits that TransUnion's credit reports do not faithfully reproduce data reported by data furnishers. Consider, for example, TransUnion's suite of CreditVision credit reports. According to the 2019 10-K, the data in these reports is "***enhance[d] by new data fields***" and by "***enriching values in existing data fields and account history***" to "provide greater granularity" into "consumer behavior patterns over time," as follows:

> ***Innovative and Differentiated Solutions***
>
> We consistently focus on innovation to develop new and enhanced solutions that meet the evolving needs of our customers. We believe our specialized data, analytics and decisioning services and collaborative approach with our customers differentiate us from our competitors. Our solutions are often scalable across different customers, geographies and verticals. Several examples of our innovative and differentiated solutions include:
>
> - ***CreditVision***: ***We continue to enhance our credit data by including new data fields, enriching values in existing data fields and expanding account history.*** Our enhanced credit data has been combined with hundreds of algorithms to produce *CreditVision* and *CreditVision Link*, first to market

---

[1] The products include Alternative Data; CECL Credit Loss Calculator; Credit Collections Insights; Credit Add Ons; CreditVision Data; CreditVision Link; CreditVision Reports; CreditVision Risk Scores; CreditVision Suite; Debt Collections Solutions; DecisionEdge; Employment Credit Reports; FICO 9 Risk Scores; Innovation Lab; Military Lending Act Search Database; Prama Data Extract; Prama Suite; Recovery Scores; Resident Screening; Risk-Based Pricing; Small Business Lending; Smart Move; TrueRisk; and Vantage Score 3.0.

and market-leading solutions that ***provide greater granularity and evaluate consumer behavior patterns over time.*** This results in a more predictive view of the consumer, increases the total population of consumers who can effectively be scored and helps consumers gain improved pricing.

41. Some "new data fields" are derived from fields reported by furnishers in Metro-2 format. For example, TransUnion consumer disclosures include a "Pay Status" field, which does not exist in the Metro-2 format. Nevertheless, the data in the Pay Status field is derived directly from the Payment Rating field, which is recognized by Metro-2.

42. TransUnion also leverages its data asset base and technology infrastructure by building solutions once and deploying them multiple times. Thus, the full suite of CreditVision credit reports is integrated into other TransUnion product offerings, including, *inter alia*, TransUnion's Portfolio Management[2] and Debt Recovery[3] solutions.

43. Technology plays a key role in TransUnion's operations. Businesses embed these solutions into their process workflows "to acquire new customers,

---

[2] The Portfolio Management service helps subscribers "address positive and negative customer credit changes quickly" and "reduce exposure to delinquencies and charge offs resulting in losses."

[3] TransUnion's Debt Recovery Solutions provides lenders with three types of data to make collections more efficient and profitable: (i) credit data, which monitors "[t]rended consumer credit characteristics and behavior" based on "[o]ver 200 predefined credit characteristics" and "[e]nriched tradeline information for over 30 months of account history"; (ii) alternative data updated daily and sourced from both public and proprietary data and (iii) "enriched data and sophisticated analytics" that purport to "[a]ccurately estimate and predict consumer behavior."

assess consumer ability to pay for services, identify cross-selling opportunities, measure and manage debt portfolio risk, collect debt, verify consumer identities and investigate potential fraud."

44. According to the 2019 10-K, the Company's technology infrastructure allows it "to efficiently integrate our data with our analytics and decisioning capabilities to create and deliver innovative solutions to our customers" in real time. Credit reports and predictive scores are delivered instantly online, whereas "solutions that help businesses interpret data . . . and apply their customer-specific criteria to facilitate real-time automated decisions at the time of customer interaction" are delivered instantly through cloud-based software, as follows:

> ***Our technology infrastructure allows us to efficiently integrate our data with our analytics and decisioning capabilities*** to create and deliver innovative solutions to our customers and to quickly adapt to changing customer needs. Our deep analytics resources, including our people and tools driving predictive modeling and scoring, customer segmentation, benchmarking and forecasting, enable us to provide businesses and consumers with better insights into their data. ***Our decisioning capabilities, which are generally delivered on a software-as-a-service platform, allow businesses to interpret data and apply their specific qualifying criteria to make decisions and take actions.***
>
> \*     \*     \*
>
> We leverage our comprehensive data assets, industry expertise and our technology infrastructure, allowing us to build solutions once and deploy them multiple times across the different verticals and regions. Our evolution to a hybrid public-private cloud infrastructure augments this capability. ***We provide services to our customers through real-time, online delivery for***

>   *services such as credit reports and predictive scores*, in batch form for services that help our customers proactively acquire new customers, cross-sell to existing customers and help them monitor and manage risk, and *through our software-as-a-service offerings, which include a number of solutions that help businesses interpret data, maximize reimbursements, visualize insights, predict model results and apply their customer-specific criteria to facilitate real-time automated decisions at the time of customer interaction*, and through our websites to consumers, for various subscription-based and transaction-based products in the United States and in other regions we serve.

45. TransUnion's embedded/integrated offerings includes its suite of Digital Lending and DecisionEdge solutions. According to TransUnion's website, each product in the Digital Lending catalogue aims to "[r]eplace traditional credit applications and deliver an intuitive, consumer-friendly digital workflow." These products "take[] a consumer from prequalification to funding in just minutes," while "processing applications faster with less manual intervention."

46. Similarly, TransUnion's DecisionEdge solutions are designed to integrate with a business's existing systems to process credit applications using proprietary data and business-specific rules.

47. The product allows users to "[a]ccess new decision points and integrate relevant data assets" and "[a]pply advanced analytics to gain insights and make the best decisions." TransUnion touts DecisionEdge as an "end-to-end solution that delivers automated decisions to the consumer."

48. A fact sheet published by TransUnion shows how a credit application is processed using DecisionEdge:



49. Through its Consumer Interactive business segment, TransUnion provides the consumer disclosures required by 15 U.S.C. §1681g. As the Company explains on its website, a consumer disclosure is a personal credit report that only

the consumer can access that includes all of the information in the consumer's credit file. By contrast, a credit report pulled by a lender is a "shortened 'business' version" of the consumer's credit report.[4] Reports obtained from annualcreditreports.com are consumer disclosures, not credit reports.

## CAUSES OF ACTION

### COUNT I

**Against TransUnion for Violations of the FCRA, 15 U.S.C. §1681e and §1681i**

50. Plaintiff repeats and realleges the foregoing allegations if set forth in full herein.

51. The FCRA imposes a duty on credit reporting agencies to devise and implement procedures to assure the "maximum possible accuracy" of credit reports. *See* 15 U.S.C. §1681e(b).

52. Upon receiving a consumer's dispute, credit bureaus are legally required to conduct an investigation and correct the disputed information contained in the report. *See id.* §1681i.

53. TransUnion failed to follow reasonable procedures to ensure maximum possible accuracy of the information reported on Plaintiff's credit reports. Specifically, TransUnion failed to follow reasonable procedures to ensure that it did

---

[4] CRAs are required to inform consumers that the content and format of data disclosed in a consumer disclosure can differ considerably from what is disclosed to lenders in a credit report. *See* 15 U.S.C. §1681g(f)(1).

not sell credit reporting solutions that improperly factored in a nonexistent current delinquency on an account that was paid and closed.

54. Although Plaintiff disputed the inaccurate information in writing, TransUnion willfully, or at least negligently, failed to perform a reasonable investigation and failed to remove the inaccurate current delinquency. Had it performed a reasonable investigation, TransUnion would have determined that the current delinquency reported by Lead Bank was inaccurate, and should be omitted from any credit reporting solution, predictive credit score, risk analytics, or decisioning product it sold to third parties.

55. TransUnion's willful and/or negligent failure to follow reasonable policies and procedures was a direct and proximate cause of Plaintiff's injury.

56. As a result of TransUnion's statutory violations, Plaintiff suffered statutory and actual damages as described herein and is entitled to recover statutory, actual, and punitive damages under 15 U.S.C. §1681n and §1681o.

## COUNT II

**Against Lead Bank for Violations of the FCRA, 15 U.S.C. §1681s-2(b)**

57. Plaintiff repeats and realleges the foregoing allegations if set forth in full herein.

58. Upon receiving notice of a dispute from a credit reporting agency, furnishers are required to conduct an investigation and correct the misleading information as necessary. *See* 15 U.S.C. §1681s-2(b)(1)(A-C).

59. Lead Bank failed to conduct a timely and reasonable investigation of Plaintiff's dispute after receiving notice thereof from TransUnion.

60. Instead of removing the inaccurate information, Defendant Lead Bank improperly verified that the reporting was accurate.

61. As a result of Defendant Lead Bank's misconduct, Plaintiff suffered actual damages in the form of lost credit opportunities, harm to credit reputation and credit score and emotional distress.

62. Defendant Lead Bank's conduct was a direct and proximate cause of Plaintiff's damages.

63. As a result of Defendant Lead Bank's statutory violations, Plaintiff suffered statutory and actual damages as described herein and is entitled to recover statutory, actual, and punitive damages under 15 U.S.C. §1681n and §1681o.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands a judgment:

a) Awarding Plaintiff statutory money damages, actual damages, and punitive damages;

b) Awarding reasonable attorney's fees, expenses, and costs; and

c) Such other and further relief as this Court may deem necessary and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

DATED: March 9, 2021                **COHEN & MIZRAHI LLP**

*/s/ Yosef Steinmetz*
YOSEF STEINMETZ
300 Cadman Plaza West, 12th Floor
Brooklyn, NY 11201
Telephone: 929/575-4175
929/575-4195 (fax)
yosef@cml.legal
Florida Bar No.:119968

*Attorneys for Plaintiff*